IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| United States of America | ) | CR/A No. 6:24-cr-00297-DCC-2 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Larry Darnell Lane, Jr., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant Lane's counseled Motions to Suppress Evidence. ECF Nos. 334, 335. For the reasons set forth below, the Motions are denied.

## I. BACKGROUND

### A. Procedural History

On April 16, 2024, Defendant Lane and ten co-defendants were initially charged by a federal grand jury in a 25-count indictment. ECF No. 2. On July 9, 2024, a federal grand jury charged Defendant Lane and other co-defendants in a 36-count superseding indictment. ECF No. 251. Defendant Lane was charged with (1) one count of participating in a drug distribution conspiracy, (2) one count of possession with intent to distribute marijuana, (3) two counts of felon in possession of a firearm and ammunition, (4) two counts of possession of a firearm in furtherance of a drug trafficking crime, (5) one count of possession with intent to distribute multiple controlled substances, and (6) one count of money laundering. *Id*.

On August 30, 2024, Defendant Lane filed two motions to suppress evidence. ECF Nos. 334, 335.  In one Motion, Defendant Lane seeks to suppress evidence seized from 25 Laws Lane, Piedmont, South Carolina ("Laws Lane") on November 5, 2020.  ECF No. 335.  In the other Motion, Defendant Lane seeks to suppress evidence seized after his vehicle was stopped leaving 47 Union Church Road, Greenville, South Carolina on February 9, 2023.  ECF No. 334.  The Government opposes both of Defendant Lane's Motions.  ECF Nos. 360, 361.  On October 22, 2024, the Court held a hearing as to both Motions.  ECF No. 366.

## B. Factual Background

Based on the evidence presented at the hearing and the filings by the Parties, the Court summarizes the facts leading to the challenged seizures underlying both Motions as follows.

    1. <u>Incident at Laws Lane</u>

        a. *Pursuit of Vehicle to Laws Lane*

At the October 22, 2024 hearing, Officers Nathaniel Dakota Hardy and Mauricio Reyes testified that, in pursuit of Marion De'Monte Wilson who was subject to an outstanding warrant for his arrest, they began following Mr. Wilson's known associate, Jailen White, via global positioning system ("GSP") data.  Tr. 13:9–14:2.  On November 5, 2020, law enforcement observed Mr. White enter a white Volkswagen sedan (the "White Sedan") with at least one other unknown subject and began covertly following him in an unmarked vehicle in hopes of detaining Mr. Wilson, who they suspected may be an occupant in the White Sedan.  Tr. 14:3–15:2.  As law enforcement was following Mr.

White, they observed the White Sedan make short stops at several locations, including a stop where one occupant of the White Sedan was seen pulling what appeared to be a suitcase from the White Sedan to an apartment. Tr. 14:11–18.

After observing the suspicious behavior, Officer Reyes was able to establish probable cause for a traffic stop, which law enforcement attempted to execute in the parking lot of the QuikTrip gas station on Mauldin Road in Greenville, South Carolina. Tr. 28:16–29:5. After law enforcement initiated emergency signals to make the stop, the White Sedan backed into law enforcement's vehicle and fled the scene, failing to stop for blue lights. Tr. 29:16–30:9. Law enforcement attempted to pursue the White Sedan, but the pursuit was cancelled after visual was lost on Highway 25 in Greenville, South Carolina. Tr. 30:2–9. Because Mr. White was in the White Sedan at the time it fled the scene, law enforcement again pulled GPS data on Mr. White. Tr. 15:15–22. The data indicated Mr. White was at 25 Laws Lane, Piedmont, South Carolina. Tr. 15:15–22. Law enforcement proceeded to Laws Lane. Tr. 15:23–16:8.

### b. *Detention of Suspects and Defendant Lane and Sweep of Property*

Upon arrival at Laws Lane, law enforcement observed the White Sedan backed into the driveway with two subjects next to it, later identified as Mr. White and Dequavious Gambrell. Tr. 16:2–8. Mr. White and Mr. Gambrell were detained for failure to stop and the hit-and-run incident. Tr. 35:18–19. Mr. Gambrell informed law enforcement that he had marijuana in his possession as well as a firearm. Tr. 19:16–19. Law enforcement testified they observed small wheel tracks and footprints going from the driveway where the White Sedan was parked into and through the backyard. Tr. 17:15–24.

As additional law enforcement was pulling up to the residence at Laws Lane, Defendant Lane exited the residence and stepped outside. Tr. 35:18–19. Law enforcement on scene testified a strong odor of marijuana emanated from the residence after Defendant Lane opened the door. Tr. 35:20–22. Officer Nathaniel Dakota Hardy testified he recognized and was familiar with Defendant Lane as a known gang member. Tr. 20:8–15. Defendant Lane indicated to law enforcement that no other persons were at the residence besides his two minor children. Tr. 35:23–24. Defendant Lane was detained by law enforcement based on the smell of marijuana coming from the home. Tr. 50:6-–7. Law enforcement entered the residence to make sure the minor children were safe. Tr. 50:12. One of the children indicated to law enforcement that their mother had just gone outside. Tr. 36:7–8. Before entering the home, law enforcement could see from the stoop of the residence that the back door was open. Tr. 35:24–36:1. Additionally, in plain view in the living area of the residence, law enforcement observed a scale, sealable bags, and "marijuana shake."[1] Tr. 46:19–21; 67:10–13.

Law enforcement looked outside in the backyard from the backdoor and saw that a back gate in the fence was open. Tr. 81:25–82:2. This open gate led to a deck where law enforcement discovered two large suitcases, one of which was unzipped, and a third suitcase was off the side of the deck. Tr. 34:24–35:4; 52:20–25. The suitcases were muddy and no tags or other identification of ownership were on them. Tr. 44:9–11; 61:25–

---

[1] "Marijuana shake" is a term commonly used to refer to small pieces of marijuana that has broken apart from a larger quantity and left behind during the packing process. *See* Tr. 72:6–9.

62:3. Investigator Jonathan Cooper looked in the partially open suitcase and saw what he believed to be marijuana inside the suitcase.  Tr. 36:20–25. Law enforcement also performed a protective sweep of the residence, coming around the back fence to the same back deck and observing the same suitcases.  Tr. 36:5–19.  Investigator Cooper applied for a search warrant of Laws Lane, which he testified was signed and authorized within approximately an hour of law enforcement's arrival.  Tr. 43:6–9.

    2.  <u>Incident at Union Church Road</u>

In December 2022, law enforcement received information from a confidential informant ("CI") that illegal narcotics were being sold out of a trailer home located at 47 Union Church Road, Greenville, South Carolina (the "Trailer").  Tr. 115:16–20.  Law enforcement began periodic surveillance of the Trailer and recorded the color, make, and model of vehicles coming and going from the Trailer.  Tr. 115:20–25.  Using this information, law enforcement conducted traffic stops on vehicles leaving the Trailer.  Tr. 115:22–23.  One vehicle frequently observed at the Trailer was a grey Lexus, registered to Defendant Lane, who law enforcement knew to be a narcotics trafficker and gang member.  ECF No. 360 at 2.  In January 2023, two separate traffic stops of vehicles leaving the Trailer resulted in law enforcement finding stolen firearms and in one of these stops law enforcement found marijuana.  Tr. 124:3–24.  Law enforcement also observed several short-stay stops at the Trailer.  Tr. 127:3–14.  In early February 2023, a pole camera was put in place to observe the Trailer.  Tr. 125:12–15.

a. *Early Traffic Stops on February 9, 2023 and Retention of Search Warrant*

On February 9, 2023, law enforcement observed Defendant Lane's vehicle leaving the Trailer and initiated a traffic stop for failure to stop at a stop sign.  Tr. 138:6–11. Defendant Lane was the sole occupant and driver of the vehicle.  A K-9 unit responded to the stop and gave a positive alert, so law enforcement searched Defendant Lane's vehicle.  Tr. 138:16–19.  Law enforcement found no contraband but did find a bundle of currency totaling over $9,000 comprised of small bills organized by denomination and held together with a rubber band. Tr. 138:20–139:1.  Defendant Lane gave contradictory reasons to law enforcement about why he had the currency.  Tr. 139:1–5, 12–23.  During the stop, law enforcement also observed that Defendant Lane had numerous keys on his key ring, including residential and safe keys.  Tr. 140:21–141:8.

Around the same time, law enforcement executed a stop on another vehicle leaving the Trailer.  Tr. 141:24–142:6.  The vehicle was occupied by Ladarius Franks, as a well as an unknown female.  ECF No. 360 at 2–3.  During the stop, Mr. Franks was found in possession of a stolen firearm and trafficking amounts of cocaine and methamphetamine.  *Id*.  Mr. Franks was arrested and charged.  *Id*.

Following these stops and law enforcement's observations at the Trailer, law enforcement believed probable cause existed that the Trailer was the site of illegal trafficking activity and sought a search warrant.  Tr. 167:1–19.  Investigator Ivan Rodriguez testified that the search of vehicles associated with the property was anticipated by, and included in, the search warrant. Tr. 183:18–24.  While waiting for the warrant to be signed, law enforcement observed a grey Lexus, later identified as

Defendant Lane's vehicle, at the Trailer and occupants going back and forth from the vehicle to the Trailer. Tr. 144:20–145:5. Law enforcement suspected that the occupants may have been tipped off by the previous traffic stops and were removing evidence from the Trailer. Tr. 143:4–11. To preserve evidence and prevent fleeing, law enforcement set up a staging area a short distance from the Trailer on Union Church Road to stop any vehicles leaving the Trailer. Tr. 144:20–145:5. Both Officer James Alexander and Investigator Rodriguez testified that law enforcement set up a potential stop down the road from the Trailer because they believed it would be safer since guns were found in other stops coming from the Trailer and there were potentially more guns in the Trailer. 147:4–7; 159:18–160:4; 168:20–169:12.

     b. *Final Traffic Stop on February 9, 2023 and Execution of Search Warrant*

After law enforcement had staged for a potential traffic stop but prior to the approval of the search warrant, two individuals exited the Trailer, got into a grey Lexus, and began to drive away from the Trailer on Union Church Road. Tr. 145:17–21. The vehicle was stopped by law enforcement between 1/10 and 1/4 miles from the Trailer. ECF No. 334 at 1. Officer Alexander testified law enforcement was concerned about officer safety in making a stop because three prior stops of vehicles leaving the trailer had resulted in the discovery of guns, persons stopped coming from the Trailer had a known propensity for violence, and based on the previous incident involving pursuing the hit-and-run vehicle to Laws Lane known associates of persons stopped coming from the Trailer had a tendency to flee. Tr. 159:18–25. Based on these circumstances, law enforcement conducted a traffic stop with guns drawn and ordered the occupants of the

vehicle to step out.  Tr. 160:5–11.  As law enforcement were exiting their vehicles, they received word that the search warrant for the Trailer had been signed.  Tr. 145:17–21.  The vehicles' occupants, Defendant Lane and Mr. Gambrell, complied with law enforcement orders, were placed in handcuffs, and transported back to the Trailer.  Tr. 160:23–161:20–22.  At that time, Defendant Lane's keys were taken.  His vehicle was later driven to the Trailer.

At the Trailer, law enforcement knocked and announced, and, after receiving no response, breached the front door without use of Defendant Lane's keys.  Tr. 171:10–15.  Law enforcement searched the Trailer.  Tr. 171:16–23.  During their search, law enforcement found a safe in the closet of a locked bedroom.  Tr. 172:5–11.  Recalling from the earlier stop that Defendant Lane's key ring had keys for safes, law enforcement used one of the keys to open the safe.  Tr. 175:6–9.  Investigator Rodriguez testified, however, that law enforcement could have gotten into the safe without the key and that the search warrant gave them authority to seize the safe and take custody of its contents.  Tr. 172:22–55;173:1–4.  In the safe, law enforcement found guns and drugs, including pills, methamphetamine, cocaine, and marijuana.  Tr. 172:5–14.  Law enforcement also found that one of Defendant Lane's keys could be used to unlock the door to the Trailer.  Tr. 173:21–174.  Investigator Rodriguez testified that law enforcement ended up towing Defendant Lane's car and taking possession of his keys subsequent to his arrest.  Tr. 179:3–6.

## II.  APPLICABLE LAW

The Fourth Amendment of the United States Constitution protects "[t]he right of the

8

people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  This right is enforced via the exclusionary rule, a judicial remedy that "prevents the government from using evidence obtained as a result of an illegal search against the victim of that search."  *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017) (citing *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).  "The right to be free from an unreasonable search is personal in nature and cannot be vicariously asserted."  *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (citing *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978)).  Suppression based on a Fourth Amendment violation "can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."  *Alderman v. United States*, 394 U.S. 165, 171–72 (1969).  Therefore, "the protections of the Fourth Amendment are activated only when the state conducts a search or seizure in an area in which there is a 'constitutionally protected reasonable expectation of privacy.'"  *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012) (quoting *New York v. Class*, 475 U.S. 106, 112 (1986)).

"Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, this Court has inferred that a warrant must generally be secured."  *Kentucky v. King*, 563 U.S. 452, 459 (2011).  "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations and internal quotation marks omitted).  Indeed, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" a narrow set of exceptions to

the warrant requirement exists such "as when exigent circumstances justify the warrantless search of a home . . . or when the need for on-the-spot response justifies a search and seizure based on reasonable suspicion." *Mora v. The City Of Gaithersburg, MD*, 519 F.3d 216, 222 (4th Cir. 2008) (citing *Brigham City v. Stuart,* 547 U.S. 398 (2006); *Mincey v. Arizona,* 437 U.S. 385, 393–94 (1978); *Terry v. Ohio,* 392 U.S. 1 (1968)).  Thus, "[courts] are to approach the Fourth Amendment and the Due Process Clause with at least some measure of pragmatism. If there is a grave public need for the police to take preventive action, the Constitution may impose limits, but it will not bar the way."  *Id.*  Accordingly, "[a]ny Fourth Amendment analysis turns on the totality of the circumstances and thus must be grounded on an accurate understanding of the facts."  *United States v. Curry*, 965 F.3d 313, 316 (4th Cir. 2020).

### III.  DISCUSSION

Defendant Lane challenges two separate incidents as constituting violations of his Fourth Amendment rights, and therefore requests the Court suppress evidence obtained by law enforcement from these two incidents.  The Court analyzes each incident in turn below.

### A.  Laws Lane

Defendant Lane contends the search of Laws Lane and the resulting seizure of contraband on November 5, 2020, was improper and unjustified under the Fourth Amendment.  *See* ECF No. 335.  Specifically, Defendant Lane argues that because Mr. Gambrell and Mr. White were secured and Defendant Lane was not subject to the investigation, there was no justification for a protective sweep of Defendant Lane's property because no facts supported a conclusion that there was a danger to law

enforcement or anyone else. *Id.* at 3–4. Defendant Lane further posits that no other justification—including exigent circumstances such as the need to pursue a fleeing suspect, protect individuals threatened with imminent harm, or prevent imminent destruction of evidence—justified the search. *Id.* at 4–5. The Government argues the totality of the circumstances supported law enforcement's decision to conduct a protective sweep of Defendant Lane's residence and property. ECF No. 361 at 6–11. The Government relies on specific exigent circumstances—such as the need to prevent destruction of evidence, pursue possibly fleeing suspects, and ascertain the welfare of two minor children—as justification permitting law enforcement's entry into the residence and property. *Id.* at 11–19. Even if entry into Defendant Lane's home was not justified, the Government argues the evidence at issue—in particular the suitcases located on a back deck outside the fence of the property—would have inevitably been discovered and the exclusionary rule is inapplicable and inappropriate based on the facts of this case. *Id.* at 19–21. Additionally, while not contesting that one of the suitcases on the back deck was improperly searched by law enforcement prior to securing a search warrant, the Government contends that Defendant Lane lacks standing to challenge the admissibility of the contents of the suitcases. Tr. 9:1–6.

1. <u>Defendant Lane's Standing to Challenge Search of Suitcase</u>

The Court finds Defendant Lane had no reasonable expectation of privacy in the suitcases located on the back deck. A search is unreasonable when it infringes on a reasonable expectation of privacy. *United States v. Jacobsen,* 466 U.S. 109, 113 (1984). "In order to demonstrate a legitimate expectation of privacy, [Defendant Lane] must have a subjective expectation of privacy," and that subjective expectation of privacy must be

"objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable." *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013) (citing *United States v. Bynum,* 604 F.3d 161, 164 (4th Cir. 2010); *United States v. Bullard,* 645 F.3d 237, 242 (4th Cir. 2011)). The burden of showing a legitimate expectation of privacy rests with the defendant. *Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980). Generally, suspects who deny ownership of property are unable to raise Fourth Amendment violations because they have no reasonable expectation of privacy in that property. *Id.*

To establish a reasonable expectation of privacy, a defendant must identify evidence objectively establishing his ownership, possession, or control of the property at issue. *Castellanos*, 716 F.3d at 834. The factors relevant to determining reasonable expectation of privacy include "ownership, possession and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." *United States v. Rose*, 3 F.4th 722, 727–28 (4th Cir. 2021) (citing *United States v. Stokes*, 829 F.3d 47, 53 (1st Cir. 2016)). When considering these factors, the Court focuses on the defendant's established connection to the property at the time the search was conducted. *See United States v. Ferebee*, 957 F.3d 406, 416 (4th Cir. 2020) (recognizing that reasonable expectation of privacy is determined as of the time of the search); *see also United States v. Jacobsen*, 466 U.S. 109, 115 (1984) ("The reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts as they existed at the time that the invasion occurred.").

12

As a general matter, Defendant Lane lacks standing to challenge the search of the suitcase because he had no reasonable expectation of privacy in the suitcase or its contents.  Defendant Lane has not affirmatively claimed ownership or dominion over the suitcases.  Instead, at the hearing he argued that his expectation of privacy on his property extended to cover everything on his property, including the suitcases.  Tr. 85:21–86:6  While the Court recognizes a warrantless search of a person's home and property is exactly what the Fourth Amendment guards against, the Court does not find the protection to be as broad as Defendant Lane posits.  Again, analysis of Fourth Amendment violations "turns on the totality of the circumstances and . . . an accurate understanding of the facts" and it is a defendant's burden to show a reasonable expectation of privacy.  *Curry*, 965 F.3d at 316; *Rawlings,* 448 U.S. at 104.

At the time the property was searched, law enforcement was in pursuit of the White Sedan, which had fled the scene of a hit-and-run incident with a police vehicle after law enforcement had already observed suspicious behavior from its occupants, including taking a suitcase from the White Sedan and leaving it at an apartment.  When law enforcement arrived at Laws Lane, they testified that small wheel tracks and footprints could be seen going from the driveway where the White Sedan was parked and into and through the backyard.  Evidence from the hearing and law enforcement testimony indicates that the suitcases on the back deck, which was located outside of the fenced backyard in a wooded area, were covered in mud and leaves.  Furthermore, there were no tags or any indication of ownership on the suitcases.  Considering these circumstances and Defendant Lane's failure to assert any ownership, possession, or control over the suitcases, the Court finds Defendant Lane has not shown he had a reasonable

13

expectation of privacy in the suitcases. *Davis*, 690 F.3d at 241; *Castellanos*, 716 F.3d at 832, 834.

   2.  Law Enforcement's Entry onto Defendant Lane's Property was Proper

   Second, even if Defendant Lane did have a reasonable expectation of privacy over the suitcases, entrance onto his property was warranted under the circumstances and the resulting search warrant would inevitably have led to law enforcement's discovery of the suitcases and their contents.

   First, exigent circumstances existed for law enforcement to perform a welfare check on the two minor children inside the home.  To determine whether entry and search under the exigent-circumstances doctrine is proper, the Court must consider whether the circumstances known to law enforcement at the time would create an "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within."  *United States v. Moss,* 963 F.2d 673, 678 (4th Cir. 1992).  The Fourth Circuit has previously found "the absence of responsible adult supervision of children is an exigent circumstance justifying a warrantless entry."  *United States v. Taylor,* 624 F.3d 626, 632 (4th Cir. 2010) (quoting *Georgia v. Peterson,* 543 S.E.2d 692, 696 (Ga. 2001)).  Here, after pursuing a vehicle involved in a hit-and-run incident with law enforcement to the residence on Laws Lane, Defendant Lane—a person law enforcement was familiar with as a known gang member and drug dealer—exited the residence.  Significantly, the smell of marijuana strongly emanated from the residence, and Defendant Lane informed law enforcement that only two minor children were present in the residence.  Law enforcement's entry into the

residence to check on the welfare of the children inside was reasonable under the circumstances. *Taylor,* 624 F.3d at 632.

That law enforcement's initial entry was reasonable does not exhaust the concerns of the Fourth Amendment. *Id.* at 632. The scope of the ensuing search after entry must also be reasonable. Indeed, "[a]ny search following warrantless entry for emergency reasons . . . must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." *Moss,* 963 F.2d at 678 (citation omitted). Again, under these circumstances, law enforcement did not transgress constitutional boundaries. Law enforcement entered the home and made direct contact with the children to check on their welfare. They did not open any drawers or cabinets. Rather, in plain view in the home was a scale with marijuana shake on it and resealable bags, which law enforcement testified are often used in drug trafficking.

Furthermore, the Fourth Circuit has found that a protective sweep is reasonable under the circumstances, when faced with the possibility that there are other persons in the surrounding area who could potentially endanger officers' safety. *United States v. Jones*, 667 F.3d 477, 487 (4th Cir. 2012). Here, law enforcement was aware or became aware of two other such persons. First, Mr. Wilson, who law enforcement believed may have been a passenger in the White Sedan, was not present when they arrived at Laws Lane and law enforcement testified that there were wheel tracks and footprints through the grass on the property. Under these circumstances a protective sweep was warranted. During a sweep of the exterior of the property, law enforcement came around the edge of the fence to where the back deck was located and found the suitcases.

Second, when law enforcement made contact with the children, one of them informed law enforcement that their mother had just gone outside. This information reasonably led to a sweep of the house and property to discover whether the mother was indeed present. Given that the back door was open upon law enforcement's arrival at the home, it was not unreasonable for them to enter the backyard and see the gate was open, which in turn led to their presence on the back deck where the suitcases were located.

3. Inevitability

The Government also argues that even if Defendant Lane's Fourth Amendment rights were violated by law enforcement's premature search of the suitcase, suppression is not warranted because the evidence would have been inevitably discovered when Defendant Lane's residence was searched pursuant to a valid search warrant. ECF No. 361 at 19–21. In contending the search warrant was invalid and resulting evidence inadmissible, Defendant Lane challenges the Government's reliance on evidence discovered in a suitcase prior to the issuance of a warrant. ECF No. 335 at 1–3. While the Government concedes this conduct by Investigator Cooper was improper and premature, it argues there was sufficient probable cause for a search warrant of Laws Lane outside of the contents of the suitcase. ECF No. 361 at 21.

Information obtained by unlawful means is nonetheless admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444 (1984). If the government can prove that the evidence inevitably would have been discovered by legal means, then "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444. "The inevitable

16

discovery doctrine may apply where additional routine or factually established investigative steps would inevitably lead to discovery of the evidence without undertaking any search." *United States v. Allen*, 159 F.3d 832, 841 (4th Cir. 1998).  Thus, there is no need to exclude evidence seized prior to obtaining a search warrant if "the evidence inevitably would have been lawfully discovered and seized during execution of the search warrant." *United States v. Jackson-Forsythe*, 498 F. App'x 224, 227 (4th Cir. 2012).  Even where a search warrant is partially based on prematurely discovered evidence, the inevitability doctrine still applies if "excluding the illegally obtained information, probable cause for the issuance of the warrant could still be found."  *United States v. Apple*, 915 F.2d 899, 910 (4th Cir. 1990).

Here, law enforcement sought and obtained a search warrant for Laws Lane relying on not only the contents of the suitcase but also the presence of the White Sedan in the driveway of Laws Lane, the distinct odor of marijuana radiating from the residence when Defendant Lane opened the door, and the absence of the mother who the children indicated had just left.  ECF No. 361-7 at 2.  While not in the application for the warrant, Investigator Cooper also testified that law enforcement believed that a wanted subject, Mr. Wilson, might be in the area and that law enforcement had already seen and knew of marijuana in the living room after their wellness check on the children, and given the totality of the circumstances would have performed a protective sweep discovering the suitcases on the back deck in any event.  Investigator Cooper further testified that the premises to be searched included areas within the property lines at Laws Lane, including the back deck.  Based on these facts and circumstances, the Court finds that law enforcement had probable cause, even without the evidence from the suitcase, to apply

for and obtain a search warrant.  Furthermore, the suitcase was within the scope of the issued warrant.  Thus, there is no need to exclude the evidence prematurely discovered prior to obtaining a search warrant because it "inevitably would have been lawfully discovered and seized during execution of the search warrant."  *Jackson-Forsythe*, 498 F. App'x at 227.  For the foregoing reasons, Defendant Lane's Motion to Suppress evidence discovered at Laws Lane is denied.

**B.  Union Church Road**

In his other Motion to suppress, Defendant Lane seeks suppression of evidence—specifically his keys—seized after his vehicle was stopped leaving the Trailer.  ECF No. 334 at 1.  Defendant Lane contends when law enforcement stopped him for the second time on February 9, 2023, they did not have authority to search and seize him since he was not on the property contemplated by the search warrant, and they were not conducting a merely investigatory stop under *Terry*.  *Id.* at 3.  Defendant Lane further argues that no exigent circumstances allowed law enforcement to seize him or his keys as no known crime had taken place at the time of the stop.  *Id.* at 5.  The Government argues Defendant Lane was stopped and his keys seized during a lawful traffic stop based on probable cause and reasonable suspicion, not simply because he was in the vicinity of the premises subject to search.  ECF No. 360 at 1, 6–13.  The Government also argues Defendant Lane's keys would have inevitably been seized as part of a search incident to arrest.  *Id.* at 18.

The Court agrees that law enforcement had probable cause and reasonable suspicion to stop the vehicle leaving the Trailer at 47 Union Church Road on the night of February 9, 2023.  Under the Fourth Amendment, "seizures" are "reasonable only if based

on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013). Probable cause to justify an arrest exists when "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Although probable cause requires "something more than [a] hunch," it does not require a finding that an individual engaged in any unlawful activity. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Instead, it requires "only a substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 243 n.13 (1983). Like probable cause, the concept of reasonable suspicion needed to make a stop is not "readily, or even usefully, reduced to a neat set of legal rules." *Sokolow*, 490 U.S. at 7–8 (citing *Gates, supra,* 462 U.S., at 232). "In evaluating the validity of a stop such as this, [the Court] must consider 'the totality of the circumstances—the whole picture.'" *Id.* (citing *United States v. Cortez,* 449 U.S. 411, 417 (1981)). While one factor by itself would not prove any illegal conduct and may well be consistent with innocent travel, taken together, conduct can amount to reasonable suspicion justifying a stop. *Id.* (citations omitted).

Based on a totality of the circumstances, there was sufficient probable cause and/or reasonable suspicion supporting law enforcement's stop of the vehicle leaving the Trailer and subsequent seizure of its occupants before executing the search warrant at the Trailer. Law enforcement observed the vehicle immediately prior to the execution of the warrant at the Trailer and observed suspicious conduct of its occupants going back and forth between the vehicle and the Trailer, which they believed were the occupants

trying to remove evidence from the Trailer.  Moreover, law enforcement had made several prior stops coming from the Trailer resulting in discovery of illegal firearms and drugs and been informed from a reliable CI that the Trailer was a stash house.  Law enforcement was also familiar with Defendant Lane and his criminal record, and indeed law enforcement recognized Defendant Lane from their previous stop of him coming from the Trailer, in which they found he had suspicious amounts of currency on him.  Under the circumstances, law enforcement had adequate grounds to detain Defendant Lane and probable cause to arrest him.  *Michigan*, 443 U.S. at 37.

Even if law enforcement had not taken Defendant Lane's keys at the time of the traffic stop on Union Church Road, the evidence at the Trailer would have inevitably been discovered.  As discussed above, suppression of evidence is not warranted when "the information ultimately or inevitably would have been discovered by lawful means."  *Nix,* 467 U.S. at 444.  Here, Defendant Lane objects to the seizure of his keys, which were ultimately used to open a safe at the Trailer and law enforcement found opened the door of the Trailer.  However, law enforcement testified the use of Defendant Lane's keys were unnecessary to the discovery of evidence in the Trailer, including the contents of the safe, because law enforcement would have accessed this evidence even without the keys.  Furthermore, Defendant Lane's keys would have been taken later upon his arrest after execution of the search warrant at the Trailer.  For these reasons, Defendant Lane's Motion to Suppress evidence from the Union Church Road stop is denied.

## IV.  CONCLUSION

For the reasons set forth above, Defendant Lane's Motions to Suppress [334, 335] are **DENIED**.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

December 16, 2024
Spartanburg, South Carolina